IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 13, 2024

## STATE OF TENNESSEE v. ANTWAN JACQUES WHITEHEAD

**Appeal from the Criminal Court for Wilson County**
**No. 2019-CR-907    Brody N. Kane, Judge**

_____

### No. M2023-01458-CCA-R3-CD

_____

Defendant, Antwan Jacques Whitehead, was convicted by a Wilson County jury for second degree murder by unlawful distribution of fentanyl, for which he received a twenty-three year sentence. Defendant appeals, arguing that the trial court erred in admitting certain text messages and that the evidence was insufficient to establish that he knew the substance was fentanyl. After review of the entire record, the briefs of the parties, and the applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which J. ROSS DYER and KYLE A. HIXSON, JJ., joined.

Adam W. Parrish, Lebanon, Tennessee, for the appellant, Antwan Jacques Whitehead.

Jonathan Skrmetti, Attorney General and Reporter; Brooke A. Huppenthal, Assistant Attorney General; Jason L. Lawson, District Attorney General (Assistant District Attorney General at trial), for the appellee, State of Tennessee.

### OPINION

### Factual and Procedural Background

This case arose from the February 14, 2019 death of the seventeen-year-old victim, J.H.[1] On June 12, 2019, Defendant was indicted for two counts of second degree murder in violation of Tennessee Code Annotated section 39-13-210(a)(2) (count one) and (a)(3) (count two). On the first day of trial, the State nolle prosequied count one and continued to trial on count two.

_____

[1] Because it is the policy of this court to protect the identity of minor victims, we will identify the victim by initials.

*Motion to Suppress*

On the morning of February 14, 2019, J.H.'s father found her deceased on her bed. It was later determined that she had died from "acute fentanyl toxicity." As discussed more completely below, officers found a cell phone near the victim's body, which was registered to the victim's father. Both the victim and her boyfriend, Richard McCoy, used the cell phone. When officers conducted a visual search of the phone, they discovered that the last communication was to a phone number later determined to be registered to Fondericka Westmoreland, Defendant's girlfriend. Both Defendant and Ms. Westmoreland used the cell phone regularly.[2] Based on this information, officers obtained search warrants for the victim's and Defendant's cell phone records for the time period between February 10 and February 14, 2019. Both cell phone records contained text messages between the victim's cell phone and Defendant's cell phone, and Defendant's cell phone records also contained text messages between Defendant's cell phone and third parties. In the messages with the victim's cell phone and third parties, Defendant discussed the purchase of "tree," "raw," and "soft."

On April 17, 2020, the State filed a motion in limine for pre-trial determination of the admissibility of the text messages as well as a notice pursuant to Tennessee Rule of Evidence 404(b) of its intent to offer the text messages between the victim's and Defendant's cell phones and Defendant's cell phone and third parties. The State asserted that the text messages were not hearsay because they were offered to "establish the identity of [D]efendant as the seller, as well as to establish the substance sold" rather than for the truth of the matter asserted. Next, the State argued that text messages from Defendant's cell phone were admissions of a party opponent, and text messages from the victim's cell phone in response were admissible "for the non-hearsay purpose" of providing proper context for Defendant's admissions. *See* Tenn. R. Evid. 803(1.2) (creating an exception to the hearsay exclusionary rule for admissions by a party opponent). Further, the State asserted that the text messages from both Defendant's and the victim's cell phones were admissible as statements of the declarant's then existing state of mind and that the cell phone records were business records. *See* Tenn. R. Evid. 803(3) (creating an exception to the hearsay exclusionary rule for statement of the declarant's then existing state of mind); *id*. 803(6) (creating an exception to the hearsay exclusionary rule for business records). Finally, the State asserted that both the victim and Defendant were unavailable to testify, and thus the text messages were admissible as statements against interest. *See* Tenn. R. Evid. 804(3) (creating an exception to the hearsay exclusionary rule for an unavailable declarant's statement which "at the time of its making . . . so far tended to subject the declarant to civil or criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.").

---

[2] While Defendant disputes the admission of text messages from this cell phone, he does not dispute that he used the cell phone; thus, for clarity, we will refer to it as "Defendant's cell phone."

On July 10, 2020, Defendant filed a motion to suppress "the telephone records detailing communications between [the victim] and Defendant" arguing that the text messages were inadmissible hearsay without an exception because the State intended to introduce the text messages "to prove not only the identity of the Defendant, but also the identity of the specific substance in question." Defendant further argued that admission of the text messages from the victim's phone would violate his rights under the confrontation clause because the victim's messages were testimonial in nature, and Defendant did not have an opportunity to cross-examine her regarding the messages. The motion made no mention of the text messages between Defendant's cell phone and third parties.

Based on the trial court's written order, it appears that a hearing on this matter was held on July 20, 2020. While the transcript of the hearing is not included in the record, two exhibits introduced at the hearing of the victim's and Defendant's cell phone records, are included in the record. On July 27, 2020, the trial court entered two written orders denying Defendant's motion to suppress, separately addressing Defendant's hearsay and confrontation clause objections. After noting that both the victim's and Defendant's cell phone records were admitted as exhibits, the trial court found "that the text messages [were] not being offered for the truth of the matter asserted." It ordered that the victim's and Defendant's cell phone records were admissible to "accomplish the rule of completeness" but "directed [the parties] to avoid characterizing or using the text messages for proving the truth of the matter asserted in their questions or in argument." The trial court then found that the text messages from the victim's cell phone were non-testimonial because they "were not made in contemplation that they would later be available for use at trial" based on the illegal activity that was the subject of the messages. *See State v. McCoy*, 459 S.W.3d 1, 14 (Tenn. 2014) (quoting *Crawford v. Washington*, 541 U.S. 36, 51-52 (2004)).

*Trial*

In February 2019, J.H.'s father lived with his son, the victim, and the victim's boyfriend, Richard McCoy, in a three-bedroom house in Lebanon. The victim and Mr. McCoy occupied the victim's bedroom, and J.H.'s father and his son stayed in the other two bedrooms of the house. J.H.'s father was not aware that the victim used any drugs other than marijuana.

On February 14, 2019, the victim and Mr. McCoy arrived home "around midnight," and J.H.'s father confirmed with the victim that she "was looking forward to going to Cracker Barrel" with him to celebrate Valentine's Day. When J.H.'s father entered the victim's bedroom the following morning, he found the victim sitting on her bed "Indian-style" with her head hanging forward and her hair covering her face. He thought she was awake but when he "touched her, she just fell over [and] didn't look alive[.]" J.H.'s father thought the victim and Mr. McCoy, who was also in the bedroom, were both dead. He

moved the victim to the living room "away from [Mr. McCoy]" because he wanted to hug her and did not want to sit in the room with what he thought were two dead bodies. He also called 911.

On cross-examination, J.H.'s father agreed that the victim had been treated for a suicide attempt in Michigan in 2014, and that police responded to a suspected suicide attempt by the victim in Tennessee in 2017. He denied that she had tried to commit suicide on either occasion. J.H.'s father recalled that when the victim and Mr. McCoy returned home the night that she died, the victim appeared to be normal, "other than being real[ly] emotional." The victim was "really emotional" over a problem with Mr. McCoy; she told him they had made up and everything was "okay." She was "so emotional that she could barely talk[,]" but she was "not as emotional" when she and Mr. McCoy went to their bedroom. Although J.H.'s father made contradictory statements regarding why he went to the victim's door the next morning, he agreed that after knocking and hearing no response, he used a coat hanger to open the victim's locked bedroom door.

Lebanon Police Department ("LPD") officer Brandon Davenport[3] responded to the victim's house after the initial responding officers requested back up. When he arrived, there were two other police units and emergency personnel already at the house. He was directed to the back bedroom, and while walking to the back bedroom, Officer Davenport saw a young female lying in the foyer area of the home "receiving life-saving measures from EMS personnel[,]" but he did not assist in her care. When he entered the back bedroom, he saw LPD Officer Jared Lake attempting to get a response from a young male who was seated on the bed. The young male was minimally responsive. After both the young male and female were transported from the scene, officers began documenting the scene but stopped to obtain a search warrant. The search warrant was issued later that same day, and Officer Davenport assisted with the execution. On cross-examination, Officer Davenport identified drug paraphernalia in some of the photographs from around the victim's house. He stated that "to [his] knowledge" this case was not investigated as a suicide. On redirect examination, Officer Davenport agreed that his role in the investigation was "fairly limited[.]"

LPD Detective Jason Bringhurst, the lead detective in this case, responded to the scene before the victim and Mr. McCoy were transported to the hospital. He later went to the hospital to obtain blood and urine samples from Mr. McCoy and sent those to the Tennessee Bureau of Investigation ("TBI") for testing. Detective Bringhurst learned later that the victim had passed away.

---

[3] At the time of trial, Brandon Davenport was a Special Agent with the Tennessee Bureau of Investigation. We will use his title on the offense date. No disrespect is intended.

While executing the search warrant, LPD officers did not find drugs or drug paraphernalia in J.H.'s father's bedroom; however, three pill bottles prescribed to the victim were found in J.H.'s father's bathroom, and a glass bong was found in J.H.'s brother's room. In the bathroom shared by the victim and her brother, Detective Bringhurst found baggies in the trash can and a prescription pill bottle in the medicine cabinet that contained a small amount of an "almost purple or dark" unknown substance. The baggies and the pill bottle were sent to the TBI for testing along with a "green substance" located in a hall closet between the victim and her brother's room. A marijuana cigarette was found in the Toyota Prius parked in the driveway of the house. On a dresser in the victim's bedroom, LPD officers found a "zip-up wallet" that contained an iPod with "stuff on top" of it, a razor blade, and a straw. Based on his experience in narcotics investigations, Detective Bringhurst believed the contents of the wallet to have been used "to snort . . . drugs." The wallet and its contents were sent to the TBI "as is." Officers found drug paraphernalia and prescription medications for the victim, Mr. McCoy, and J.H.'s father throughout the victim's bedroom. A white iPhone was found on the victim's bed.

Defendant requested a jury-out hearing to discuss the admissibility of the victim's cell phone and the corresponding records. Defendant argued that the text messages between the victim's and Defendant's cell phones contained inadmissible prior bad acts, violated the confrontation clause, that Defendant's contact name was inadmissible hearsay, and text messages between Defendant's cell phone and third parties were inadmissible hearsay. The State noted that there had been a pretrial hearing related to this issue, and that it only intended to introduce the messages between Defendant's cell phone and third parties "that say things like, Who is this? This Twan." The trial court noted Defendant's objection "for the record" and stood by its prior ruling that the text messages were admissible.

After the jury-out hearing, Detective Bringhurst was qualified as an expert in "drug terminology." Detective Bringhurst explained that he performed an extraction on the victim's cell phone, which showed text messages "[i]n reference to narcotics transactions" between the victim's cell phone and a contact saved as "My Big Brudda Twan." The State admitted, and Detective Bringhurst read into the record, four separate text message threads: Exhibit 21, text messages in the early morning hours of February 10, 2019; Exhibit 22, text messages from the evening of February 10, 2019, through the early morning hours of February 11, 2019; Exhibit 23, text messages from approximately 8:00 a.m. on February 12, 2019, through approximately 12:00 a.m. on February 13, 2019, and Exhibit 24, text messages from approximately 9:00 p.m. on February 13, 2019, until 1:49 a.m. on February 14, 2019. Defendant renewed his objection for only Exhibit 21.

Detective Bringhurst learned through his investigation that both the victim and Mr. McCoy used the victim's cell phone, and he was unable to determine whether the victim

or Mr. McCoy sent most of the text messages. Detective Bringhurst explained that, in his experience, "raw" meant fentanyl, "tree" meant marijuana, "soft" meant powder cocaine, and "g" meant a gram. Detective Bringhurst was able to determine that the victim was the recipient and sender of the following text messages regarding a drug deal with Defendant's cell phone beginning at 8:41 p.m. on February 13, 2019:

> [My Big Brudda Twan]: We got some new lil raw bruh its fye it's like that pink s*** but this s*** fye lil bruh
>
> [The victim]: He gets off at 12 and he got $20
>
> [My Big Brudda Twan]: Ok is this sis?
>
> [The victim]: yes
>
> [My Big Brudda Twan]: Ok hey girl . . . this s*** we got now is some KILLA

Detective Bringhurst explained that "raw" referred to fentanyl and that "fye" meant the drugs were "good." A text message from the victim's cell phone to "My Big Brudda Twan" just after 12:00 a.m. on February 14, 2019, indicated that the victim and Mr. McCoy were on their way to Nashville to purchase the drugs. At 1:06 a.m. a text was sent from the victim's cell phone stating, "He's at the door", and "My Big Brudda Twan" responded "K" at 1:17 a.m. The last text message from the victim's cell phone was sent to "My Big Brudda Twan" at 1:49 a.m. and said: "[a]yyyi isthis is [the victim] and raw thraw is f****** amazing thank you so much needa get this every time family on god[.]"

After reviewing the text messages from the victim's cell phone, Detective Bringhurst determined that the phone number saved as "My Big Brudda Twan" was "in use by Google." After executing a search warrant on Google, Detective Bringhurst learned the cell phone number was registered to Fondericka Westmoreland. Detective Bringhurst located Ms. Westmoreland and Defendant at the address connected to the Google cell phone records. Detective Bringhurst "assume[d]" that Ms. Westmoreland was Defendant's girlfriend.

The State then introduced, and Detective Bringhurst read into the record, portions of the Google cell phone records.[4] Defendant did not object to the introduction of any of

---

[4] The dates and times list in the Google records were in "Universal Time," and Detective Bringhurst explained that Wilson County is "in Central time," which was six hours behind "Universal Time" at the time of the victim's death. Detective Bringhurst converted the dates and times listed on the Google records to Central time by subtracting six hours from the time listed on the Google records. For clarity, we will refer only to the dates and times as converted to Central time.

the Google cell phone records. The Google cell phone records showed the previously admitted text message threads between the Google phone number and the victim's cell phone. Additionally, the Google cell phone records showed text messages to and from the Google phone number to third parties which identified the user of the Google phone number as "c twan" and "Mr. Whitehead" at various times between February 10 and February 14, 2019. Detective Bringhurst agreed that just before and after the final text message exchange with the victim's cell phone, the user of the Google phone number identified himself as "Twan" in text messages to third parties.

Detective Bringhurst interviewed Defendant and Ms. Westmoreland at their residence on April 11, 2019. He identified Defendant in court as the man he interviewed. During the interview, Defendant acknowledged that he sold marijuana to the victim and Mr. McCoy but denied selling "anything other than marijuana." Defendant explained that if a person reached out to Defendant for "narcotics other than marijuana, . . . he would . . . direct them to a certain person, but he did not do the deals directly."

On cross-examination, Detective Bringhurst agreed that he "frequently encounter[ed] people who've committed suicide by overdose" in the course of his career. J.H.'s father did not mention any prior suicide attempts during Detective Bringhurst's interview; if he had, Detective Bringhurst would have looked into suicide as "a potential avenue of investigation[.]" Detective Bringhurst denied ever hearing cocaine referred to as "raw," but agreed that the word "fentanyl" was never used in the text messages on the victim's cell phone. He explained that fentanyl was initially "more of an additive[, but] [n]ow it's more pure." Detective Bringhurst agreed that at the time of his April 11 interview with Defendant, it was his belief that Mr. McCoy had "actually provided those narcotics" to the victim. He believed that the final drug exchange between Defendant and Mr. McCoy involved fentanyl and marijuana.

After reviewing a portion of the victim's cell phone records, Detective Bringhurst agreed that there was "no way to know which one of them [was] texting" at any given moment. The following exchange then occurred:

[Defense counsel]: . . . Do you know why the messages from [line] . . . 14 to 47 are missing?

[Detective Bringhurst]: Sure. These are just edited for their conversations for . . . exhibit purposes.

[Defense counsel]: Edited? So, for the purpose of at least the exhibit admitted by the State, . . . that is not reflective or indicative of all the

correspondence or all communications between those numbers on that date, correct?

[Detective Bringhurst]: Between all these numbers, yes.

. . .

GENERAL LAWSON: And, Judge, if you'll give me a minute, I'd be happy to provide one that has everything on it. [Defense counsel] could admit it, if he'd like to. I will need to get a copy of it out of my car.

[Defense counsel]: I think that's probably the best way to handle it, Your Honor.

Defendant then introduced Exhibit 32, ten-pages of the victim's cell phone records which included all text messages exchanged between the victim's cell phone and Defendant's cell phone from 1:51 a.m. on February 10, 2019, through 1:49 a.m. on February 14, 2019. Based on the text messages, Detective Bringhurst opined that the last drugs the victim and Mr. McCoy purchased from Defendant were marijuana and fentanyl. He agreed that Defendant's name was never mentioned in the text messages and that Ms. Westmoreland's name was mentioned twice.

Detective Bringhurst was later recalled as a witness and testified that during the April 11 interview, Defendant said that he only sold marijuana because "the other narcotics could potentially kill people." Additionally, when Detective Bringhurst showed the Google phone records to Defendant, Defendant did not deny that he sent the relevant text messages from the Google phone number, and Ms. Westmoreland did not take ownership of them.

Richard McCoy had been in a relationship with the victim for eleven months prior to her death, and he had lived with her for approximately eight of those months. On February 13, 2019, J.H.'s father picked up Mr. McCoy after Mr. McCoy had finished work, and they arrived home just after midnight. Mr. McCoy and the victim left for Nashville "around 2:00 a.m." in J.H.'s father's Toyota Prius because the victim had arranged for them to pick up a "tenth" of heroin in Nashville. Mr. McCoy and the victim had last used heroin about "two or three days before."

The victim and Mr. McCoy drove toward "Panorama Apartments" to buy heroin from "Twan." Mr. McCoy identified Defendant in court as the man he knew as Twan; Mr. McCoy denied ever purchasing heroin from another person. Mr. McCoy knew that Defendant lived with his girlfriend, "Dericka," and their children. When they arrived at

Defendant's apartment, Mr. McCoy went to the door while the victim remained in the car. Mr. McCoy gave Defendant $20 in exchange for a bag that he "thought was [a tenth of a gram of] heroin, but it turned out to be fentanyl." Mr. McCoy affirmed that he always purchased "a tenth" of heroin from Defendant for $20 and that there was no discussion between him and the victim to purchase more that night. Mr. McCoy did not purchase any other drugs from Defendant that night.

On his way back to the car, when Mr. McCoy opened the bag, he "dropped half the bag" in the parking lot of the apartments; he left the dropped drugs in the parking lot and returned to the car. He and the victim then split the remainder of the drugs equally and "snorted it . . . with a straw" in the parking lot which was always how they ingested it. He had never seen the victim "use needles and shoot it[.]" Mr. McCoy then drove himself and the victim back to Lebanon. Neither Mr. McCoy nor the victim ingested any more drugs that night.

When they arrived home between forty and fifty minutes later, "all [Mr. McCoy] remember[ed]" is that they spoke to J.H.'s father then went to the victim's room and locked the door. Mr. McCoy had ingested heroin before, but it affected him differently that night, making him "feel more energetic." He and the victim had been in an argument earlier that week, but "it was over" and "[t]hings were worked out" the night they purchased the drugs. He described the victim as "kind of like depressed" before she snorted the drugs and "euphoric" after. Mr. McCoy remembered "waking up in an ambulance" the next morning. He was admitted to the hospital and treated for an overdose; he suffered "six heart attacks" and learned that the victim had died. Mr. McCoy suffered from "PTSD" and "panic attacks" and had not used drugs, other than marijuana, in the year after the victim's death. Mr. McCoy was "surprised" to learn that neither he nor the victim had heroin in their systems that night.

Mr. McCoy explained that he had saved Defendant's cell phone number as "My Big Brudda Twan" because that is who he believed he was communicating with when he texted that phone number. He identified Defendant as the person he intended to communicate with when he texted "My Big Brudda Twan" and denied purchasing drugs from another person when he arranged a drug purchase with "My Big Brudda Twan." At the direction of the State, Mr. McCoy went through each text message in Exhibit 32, noting whether he or the victim had sent the text message to Defendant. Mr. McCoy relied upon his knowledge of how each of them texted, the pronouns used, the content of the messages, and the time of the messages to identify who sent each text message. Mr. McCoy explained that "raw" meant heroin.

On cross-examination, Mr. McCoy agreed that he had been a drug dealer about a year prior to the victim's death but denied dealing drugs since that time. Mr. McCoy read

his April 2019 statement to Detective Bringhurst into the record. In the statement, Mr. McCoy told Detective Bringhurst:

> It was supposed to be heroin. I snorted it. We had done it three or four times. This stuff was different. I was high as usual, but not, I . . . was shaking real bad. I should have told her no the first time we did it. Twan gave me the drug. I didn't think much of it, because . . . they use it, too. Must have been something his dealer's dealer did. . . . I had used grey heroin before. This . . . was hard to break down. It was tan.

After he snorted the drugs, Mr. McCoy drove approximately forty-five minutes home without issue but he "was feeling funny." He agreed that after the drive, the victim had a twenty-to-thirty minute conversation with J.H.'s father before he and the victim went to the victim's bedroom. Mr. McCoy affirmed that he believed Defendant did not know that the drugs were different from what he usually sold them.

Mr. McCoy agreed that he was the person primarily in contact with Defendant and that, other than the contact name, Defendant was not identified in the text messages obtained from the victim's cell phone. In reviewing Exhibit 32, Mr. McCoy agreed that he was using the content of the messages to determine who sent the message but there was "[n]o way beyond reasonable doubt" to know who sent each text message from the victim's cell phone. Mr. McCoy had not previously heard fentanyl referred to as "raw" and did not know what "raw thraw" was. On redirect examination, Mr. McCoy reaffirmed that he purchased the drugs that killed the victim from Defendant.

TBI Special Agent Andrea King, a "forensic chemist expert," received various exhibits collected from the victim's house, including unidentified substances and pill bottles. Through her testing, Special Agent King identified the cigarette collected from the Toyota Prius as a marijuana cigarette, the white powder residue on the iPod found in the wallet as containing heroin and fentanyl, and the substance found in a "baggie" on the nightstand as 20.90 grams of Mitragynine, a non-controlled substance. She "visually identified" all of the pills as non-controlled substances. On cross-examination, Special Agent King agreed that the subject listed on her lab report was Mr. McCoy and that she did not test every exhibit sent to the lab. On redirect examination, Special Agent King explained that Mr. McCoy's name was on her lab report because it was on the submittal form. On recross-examination, Special Agent King admitted that she "was not aware" that Mitragynine was a "Schedule I narcotic in 2017."

TBI Special Agent April Bramlage, an expert in forensic toxicology, tested blood and urine samples from Mr. McCoy obtained at the hospital on February 14, 2019; her report was entered into evidence. Mr. McCoy's blood sample was positive for fluoxetine

and norfluoxetine, but opiates, including heroin and fentanyl, were "presumptively not detected." Fentanyl was found in Mr. McCoy's urine sample. Special Agent Bramlage explained that it was "not uncommon to not find a sample in the blood, but then find it in the urine, because the urine is where everything is going to dump into and that's [the] final exit point for all the drugs that you take." On cross-examination, Special Agent Bramlage agreed that fentanyl could be prescribed for chronic pain. She explained that the peak effect of fentanyl would be "within minutes." Special Agent Bramley could not estimate how a certain amount of fentanyl would affect a person after a specific amount of time like one could with alcohol, because "[d]rugs are different" and each individual processes drugs in a different way.

Dr. Gulpreet Bowman, an expert in forensic pathology, performed the victim's autopsy. Dr. Bowman determined the victim's cause of death to be "acute fentanyl toxicity" and the manner of death to be an "accident." Dr. Bowman's autopsy report and the victim's toxicology report were admitted into evidence. Dr. Bowman found no abnormalities during her internal and external examinations of the victim, but the victim's femoral blood contained fentanyl, norfentanyl, Narcan, THC, a tobacco by-product, a gastrointestinal medication, and caffeine. She explained that norfentanyl was a metabolite of fentanyl, meaning that it was "one of the breakdown products of fentanyl[.]" The victim's blood contained 18 ng/mL of fentanyl, "180 times the reporting threshold" of .1 ng/mL. On cross-examination, Dr. Bowman agreed that markings on the victim's extremities "could be" consistent with intravenous drug use.

The State then rested its case. Defendant moved for a judgment of acquittal, which was denied. Defendant waived his right to testify and did not present proof. Based on the above evidence, the jury convicted Defendant as charged of second degree murder by unlawful distribution of fentanyl. Following a sentencing hearing on November 24, 2020, the trial court sentenced Defendant to twenty-three years' incarceration to be served at 100%. Defendant's December 18, 2020 motion for new trial was denied on September 14, 2023.[5] Defendant filed his timely notice of appeal on October 16, 2023. *See* Tenn. R. App. P. 4(a) (stating that a notice of appeal must be filed within thirty days of the entry of the final judgment); *id.* 21(a) (stating that if the last day of the time period "is a Saturday, a Sunday, or a legal holiday . . . the period runs until the end of the next day which is not one of the aforementioned days").

---

[5] The reason for the approximately two-and-one-half-year delay is unclear from the record.

**Analysis**

I.     Sufficiency of the Evidence

Defendant argues that there was insufficient evidence to establish that he "knew or should have known that the substance contained fentanyl" and thus, the statute resulted in "an unintended and unconstitutional strict liability offense." The State asserts that the evidence was sufficient for the jury to find that Defendant acted recklessly in delivering fentanyl to the victim. We agree with the State that the evidence was sufficient to support Defendant's conviction.

When evaluating the sufficiency of the evidence on appeal, the relevant question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see* Tenn. R. App. P. 13(e). The standard of review is the same whether a conviction is based on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (citing *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." *State v. Shackleford*, 673 S.W.3d 243, 250 (Tenn. 2023) (quoting *Hanson*, 279 S.W.3d at 275). Further, the State is afforded "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)).

The jury evaluates the credibility of the witnesses, determines the weight to be given to witnesses' testimony, and reconciles all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence. *Dorantes*, 331 S.W.3d at 379. A guilty verdict "accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997) (citing *State v. Grace*, 493 S.W.3d 474, 476 (Tenn. 1973)). This court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." *Wagner*, 382 S.W.3d at 297 (citing *Bland*, 958 S.W.2d at 659).

Second degree murder as charged in this case is the "killing of another by unlawful distribution or unlawful delivery or unlawful dispensation of fentanyl . . . when [that] substance[] alone, . . . is the proximate cause of the death of the user." T.C.A. § 39-13-

210(a)(3). Delivery is "the actual, constructive, or attempted transfer from one person to another of a controlled substance, whether or not there is an agency relationship." *Id.* § 39-17-402(6).

Tennessee Code Annotated section 39-13-210(a)(3) "neither expressly requires, nor plainly dispenses with, the requirement for a culpable mental state[, thus,] 'intent, knowledge, or recklessness' suffices to establish the necessary culpable mental state." *State v. Hollon*, 671 S.W.3d 561, 565 (Tenn. Crim. App. 2023) (citing T.C.A. § 39-11-301(c)). To convict a defendant of second degree murder by the unlawful distribution of fentanyl, the State must prove that: 1) the defendant unlawfully distributed a substance to the victim; 2) the substance delivered to the victim was fentanyl; and 3) the fentanyl was the proximate cause of the victim's death. *Id.* at 566; *see* 7 Tenn. Prac. Pattern Jury Instr. T.P.I. – Crim. 7.05(b). When a defendant is not aware that the substance contains fentanyl, the State may still establish that a defendant acted recklessly by proving beyond a reasonable doubt that:

- the defendant disregarded a substantial and unjustifiable risk that the substance delivered to the user was fentanyl or carfentanil; and

- the defendant's disregard of that risk "constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint."

*Id.* at 566.

When viewed in the light most favorable to the State, the proof showed that Defendant was the victim's and Mr. McCoy's drug dealer, and he frequently sold the pair "tree" and "raw." Detective Bringhurst testified, as an expert in drug terminology, that "raw" referred to fentanyl and "tree" referred to marijuana. Just before 9:00 p.m. on February 13, 2019, Defendant texted the victim's cell phone that he had "some new lil raw bruh it's fye it's like that pink s*** but this s*** fye lil bruh[.]" The victim responded that Mr. McCoy was at work, but he would have money for a drug purchase when he got off work. Defendant acknowledged that he was texting with the victim and reaffirmed that "this s*** we got now is some KILLA[.]" After Mr. McCoy finished work and returned home, he drove himself and the victim to Defendant's apartment where he purchased what Mr. McCoy believed to be heroin from Defendant. Mr. McCoy and the victim then "snorted" the drugs in the parking lot of Defendant's apartment before returning to the victim's house. Mr. McCoy testified that neither he nor the victim ingested any other drugs after they snorted the drugs in the parking lot. Based on his review of the text messages and his knowledge of drug terminology, Detective Bringhurst opined that the final drug exchange between Defendant and Mr. McCoy was for fentanyl and marijuana. The

victim's blood and Mr. McCoy's urine sample tested positive for fentanyl and negative for heroin. Due to the lack of abnormalities found during the victim's autopsy, Dr. Bowman determined the victim's cause of death to be "acute fentanyl toxicity."

Although Defendant elicited testimony that Ms. Westmoreland also used Defendant's cell phone, Mr. McCoy stated that when a drug purchase was arranged via text message with Defendant's cell phone, he always purchased the drugs from Defendant, not Ms. Westmoreland. Mr. McCoy affirmed that he purchased the drugs that killed the victim from Defendant. Further, while it is true that Mr. McCoy conducted the physical exchange of cash for drugs with Defendant, the text messages showed that Defendant knew that the victim had organized the drug purchase while Mr. McCoy was at work.

Here, Defendant does not contest that he unlawfully distributed a substance ultimately determined to be fentanyl, or that fentanyl was the proximate cause of the victim's death. Rather, Defendant asserts that the State failed to establish that he "knew or should have known" that the substance was fentanyl rather than heroin. However, the State was not required to prove that Defendant knew the substance was fentanyl, only whether Defendant acted intentionally, knowingly, or recklessly regarding whether the substance he delivered was fentanyl.[6]

The jury was instructed that in order to find Defendant guilty, it was required to find that Defendant "acted either intentionally, knowingly or recklessly." Appellate courts are to "presume that the jury follows all instructions given by the trial court." *State v. Harbison*, 539 S.W.3d 149, 163 (Tenn. 2018). Detective Bringhurst testified that "raw" was the street term for fentanyl, and he opined that the last drug transaction involved fentanyl and marijuana. Although Mr. McCoy testified that he understood the term "raw" to mean heroin, the jury evaluated the proof and the credibility of the witnesses and could have reasonably found that Defendant intentionally or knowingly distributed fentanyl to Mr. McCoy and the victim.

Further, the proof adequately supported a finding that Defendant disregarded the substantial and unjustifiable risk that he sold fentanyl to Mr. McCoy. Based on his text messages, Defendant was aware that the substance he advertised to the victim was different than what he usually sold. Defendant texted the victim that the substance was "fye" and

---

[6] Although Defendant states in his brief that "this incident occurred in early 2019, before public awareness of fentanyl as a street drug became common place," the record reflects that Defendant did not make this argument to the jury, and as such we will not consider it. *See State v. Hardison*, 680 S.W.3d 282, 309 (Tenn. Crim. App. 2023) (stating that an appellant cannot "take one position regarding an issue in the trial court, change his strategy or position in mid-stream, and advocate a different ground or reason on appeal").

"KILLA." Mr. McCoy told police shortly after the victim's death that the substance he purchased from Defendant was a different color, visually different from what he usually purchased. Based on the proof, the jury could have reasonably determined that Defendant unjustifiably disregarded the substantial risk that the substance he sold to Mr. McCoy and the victim was fentanyl and that Defendant's conduct constituted a gross deviation from the ordinary standard of care. Mr. McCoy's belief that Defendant did not know the substance was fentanyl did not negate the fact that Defendant disregarded the substantial risk that the substance could be fentanyl. The evidence was sufficient to support Defendant's conviction for second degree murder by unlawful distribution of fentanyl. Defendant is not entitled to relief.

## II.     Admission of Text Messages

Defendant asserts that the trial court erred in admitting text messages from the victim's and Defendant's cell phone records. Specifically, he asserts that: 1) admission of text messages from the victim's cell phone to Defendant's cell phone violated his rights under the confrontation clause; 2) Defendant's contact name in the victim's cell phone was inadmissible hearsay because it was offered for the truth of the matter asserted; 3) the text messages between the victim's cell phone and Defendant's cell phone included "uncharged conduct and prior bad acts" that were inadmissible under Tennessee Rule of Evidence 404(b); and 4) Defendant's text messages with third parties were inadmissible hearsay. The State asserts that Defendant has waived each of his claims, and he is not entitled to plain error relief. We agree with the State.

Regarding the text messages between the victim's cell phone and Defendant's cell phone, the State asserts that Defendant has waived his objections because "he strategically introduced the allegedly offending evidence" as Exhibit 32.[7] We agree. Defendant introduced Exhibit 32, which included the entirety of the text messages between the victim's cell phone and Defendant's cell phone previously admitted in redacted form by the State, Defendant's contact name in the victim's cell phone, and additional text messages between the victim's and Defendant's cell phones. *State v. Williams*, 851 S.W.2d 828, 833 (Tenn. Crim. App. 1992) ("Evidence, even if inadmissible, cannot be the basis for error if elicited by the complaining party."); *State v. DaCanto*, No. 01C01-9209-CC-00288, 1993 WL 331824, at * 2-3 (Tenn. Crim. App. Aug. 26, 1993) (concluding that the defendant had waived objection to a witness's testimony during cross-examination because the defendant had elicited the testimony, even after the witness testified similarly on direct examination), *reversed and remanded on other grounds* (Tenn. Sept. 25, 1995); Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or

---

[7] We note that the State raises a number of other waiver arguments that we do not need to address to resolve this matter.

nullify the harmful effect of an error."). Defense counsel used Exhibit 32 to extensively cross-examine Detective Bringhurst and Mr. McCoy to question whether the sender of the text messages from Defendant's cell phone was Defendant or Ms. Westmoreland, and whether Mr. McCoy or the victim was the sender of the text messages from the victim's cell phone. He also used the exhibit to argue that Mr. McCoy, not the victim, sent the majority of the text messages to Defendant. Further, during closing, defense counsel specifically noted that "nowhere . . . in 147 text messages between February the 10th and the 14th is [fentanyl] ever even referenced or used." Defense counsel continued:

> If you recall, . . . we got two or three pages into this, and suddenly we skipped down here, three or four pages down. I said, Wow, wait a second, we had to take a little bit of a break, and I got those records out, and guess what? Guess what's in those three or four pages we missed? The only time raw was discussed being purchased, and guess who it was from? Not him. Who? Dericka, Dericka, Dericka. Twice in that page, in that span of pages, we know who's dealing raw, then, right? Dericka, not him.

While we acknowledge that the State first introduced portions of the text messages from the victim's cell phone, Defendant introduced the entirety of the text messages from the victim's cell phone and extensively relied upon the portions not introduced by the State.

Defendant has also waived his objection regarding the text messages between Defendant's cell phone and third parties by failing to contemporaneously object and by raising this argument for the first time on appeal. Defendant made no objection to Exhibits 27, 29, and 30, and he affirmatively stated that Exhibits 26, 28, and 31 were introduced "without objection." *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); *State v. Halake*, 102 S.W.3d 661, 669 (Tenn. Crim. App. 2001). Additionally, Defendant's motion to suppress did not request suppression of the text messages between Defendant's cell phone and third parties.

Further, Defendant has waived his claim regarding the text messages between Defendant's cell phone and third parties by failing to include it in his motion for new trial. *State v. Woods*, No. M2019-01504-CCA-R3-CD, 2020 WL 6036815, at *4 (Tenn. Crim. App. Oct. 12, 2020) (finding the defendant waived an issue by failing to raise it in his motion for new trial); Tenn. R. App. P. 3(e) (stating that "no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, . . . unless the same was specifically stated in a motion for a new trial"). Although Defendant's motion for new trial broadly challenged "the admissibility of . . . cell phone records and messages attributed to Defendant," his argument at the hearing focused on the text messages between

the victim's cell phone and Defendant's cell phone, which he argued included other prejudicial drug transactions.

Defendant did not request that we conduct plain error review, even after the State asserted waiver in its brief and this court granted Defendant's motion for extension of time to file his reply brief. The record reflects no "particularly compelling or egregious circumstance" that would justify sua sponte plain error relief. *State v. Mathews*, No. M2022-01210-CCA-R3-CD, 2024 WL 4039728 (Tenn. Crim. App. Sept. 4, 2024) (quoting *State v. Thompson*, No. W2022-01535-CCA-R3-CD, 2023 WL 4552193, at *5 (Tenn. Crim. App. July 14, 2023)) ("Where a defendant fails to respond to a waiver argument, only particularly compelling or egregious circumstances could typically justify our sua sponte consideration of plain error relief."), *no perm. app. yet filed*; *see State v. Powell*, No. W2011-002685-CCA-R3-CD, 2013 WL 12185202, at *8 (Tenn. Crim. App. Apr. 26, 2013).

Defendant is not entitled to relief.

## Conclusion

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
JILL BARTEE AYERS, JUDGE